I'm going to go ahead and start. May it please the Court, I'm Anne McClintock, the Federal Defender's Office, on behalf of Kevin Litanifam. With me on argument this morning is going to be Karen Landau for Mr. Luong. Also at council table is Kathleen Page for Mr. Nguyen. Mr. Pirelli I have not seen yet, but he wasn't planning on arguing. As I said, Ms. Landau and I will share the argument. I plan about eight minutes, hopefully, to discuss the jury will issue and the juvenile sentencing, and then she will use a like amount of time to discuss three issues, the Hobbs Act robbery of intangible property, prosecutorial misconduct in closing, and the 924C-925I double jeopardy and punishment issue. So first, the 1998 grand jury pool. This is an unusual case in the sense that it was denied in a, as not stating a primate patient case, and yet the record is, factual record is fully developed. It's both the defendants and the government gave statistical expert testimony through the declarations that I attached to the supplemental excerpts of record, and there's no factual disagreement between the experts. So the evidence that we have shows that there was substantial racial and ethnic underrepresentation of his family. Sotomayor Is there evidence of systematic exclusion that resulted in this disparity? What is that evidence? The specific evidence of the systemic, systematic component, it can be found in Dr. Weeks's declaration where he discusses the rate at which the disparities are a product of jury registration rates. This was table 7. It's at the joint excerpts of record at pages 16 and 46. Yes, the supplemental joint excerpts of record, excuse me. I'm sorry, what page? Let me open it up. The supplemental joint excerpts of records, page 6. Supplemental, this is the government's. Ours, at the very end. It was submitted along with the Appellant supplemental. Appellant supplemental, yes. Okay, I'm sorry, what page was that? 16 and 46, I have. So you said 16 and then you said 46? 46. It's 16 and 46? Yes. At page 16, I believe it's Dr. Weeks's declaration where he discusses in the text that Hispanics and blacks, I'm sorry, at lines 24 through 26. Okay. Hispanics and blacks have significantly lower rates of voter registration among citizens aged 18 and older than do non-white Hispanics. On the next page, it's the use, lines 1 through 3. It is the exclusive use of voter registration lists that has created the disparities. And then the later reference to 46 is the table that he references in that text. So he actually looked at voter registration rates among the different ethnicities and racial groups, found that there is this disparity, and that satisfies the systematics problem. But the question that Gregor asked is a systemic exclusion. Where is the evidence of that? That's the evidence. To prove that you have a systematic exclusion, it requires that you show that the system that is being used, because of the way that it's put together, causes the exclusion of this group. And since the Eastern District's Sacramento Division, to this day, still just uses jury pools and refrains from using any supplemental... That's a description of an effect, but it's not really the kind of, as I understand what the Supreme Court was getting at in Durin, however it's pronounced properly, it's looking for something that is more intentional than happenstance. Well, I think that's the distinction between a Sixth Amendment and statutory basis for discrimination than it is from the equal protection. In an equal protection case, like in Castaneda, they want evidence of a specific intent, and that issue is abandoned if it was raised. I think the additional... No, but in Durin, the systematic exclusion was because of a statutory exemption. It was a statutory exemption that didn't preclude women from appearing, but the way that the system worked is that women had a presumption if they didn't appear that they were invoking their waiver, and there was no effort to narrow it down. The stated reason for it was because women needed to be in their home and take care of the kids in the home, and there was no reason. It was an additional burden for the courts to... But isn't that different from using a racially neutral on its face, a facially neutral system that happens to have an effect? It's not known to be... I mean, it's not... I guess it's not sort of saying, well, only people above a certain height can go, or you're pretty sure that women will be disproportionately disadvantaged. I guess I have some difficulty seeing that as sufficient evidence of... Systemic exclusion. Well, there is more evidence that Dr. Weeks put on in talking about how simple and the effects that adding the DMV, both the registration, the driver's license and ID information would have, that one of the... Where is that? It's in the same references on page... It continues on the supplemental joint excerpt on page 17. Well, that would make it better, but that doesn't mean that the current system is a systematic... That it shows evidence of systematic exclusion. To look for something better isn't to say that the existing thing is unconstitutional. Well, his analysis is that the sole cause of this differential is because of the exclusive use of the voting registration as the information pool. That there's nothing else. There's no evidence of some other... I mean, they've taken into account in his analysis whatever differentials there were for felony rates or not being in the district for more than the year or for language difficulties. All of those other things that are part and parcel of qualifying for jury pool. I think this court... How is it that... I mean, in Hernandez, we basically said, well, you can use any of these interesting tests such as may commend themselves to the district court, but nonetheless, in that situation, which I think was in all important respects identical, that is, it used the voter registration exclusively, we held that there was no systematic exclusion. In that case, there had been no evidence put on of the nature that Dr. Weeks put on. There was a lot of expert evidence in that case, though. But not as to the... And some other tests showing that... And all those went to the portion dealing with the substantial discrimination or the substantial disparity prong, the second prong. There was no evidence put on to show that the system actually had this effect, as far as that it was something about the nature of the system, and that's the difference in this case. I was hoping to yield in about 30 seconds to Ms. Wong for the other... This is a case where there's a problem with... or problems raised with the grand jury composition, but your client has actually been tried and found to be guilty. Yes. What's the remedy if you find that there is a problem with a grand jury pool? Well, this court... I don't have a case in front of me. I cited it in the brief, but this court has said that the grand jury pool is no good and we need a new indictment and we start over. Seems like a strange remedy for a... Well, I mean, grand juries have more power than just rubber stamping what the government says is the evidence, and even if they believe that the evidence presented is sufficient, they still have authority to decide... You don't have a defendant who's actually been tried by a grand jury and found to be guilty of a crime. We do, and that's part of the delay in this case, and that doesn't make... There was no attempt at an interlocutory appeal on this issue? Not on this one, no. Okay. There were other issues? There was an attempt to take an interlocutory appeal on a... I'm trying to remember. I don't think it was the intangible... It was the intangible Hobbs Act. No, it was double jeopardy. The double jeopardy issue, and this court found there was no jurisdiction because it wasn't a final order. If there are no other questions on that, I want to address briefly Mr. LaTonafon's unique issue regarding the sentence that he received as a juvenile. The government's taken the view that the Miller v. Alabama case has no impact on this decision, on this sentence, and I think that's wrong, but I also think that the sentencing decision that Jeff Shedd made is unlawful both under the traditional reasonableness review that we do under Carty, but also under the Eighth Amendment and under the Fifth and Sixth Amendments because of the specific factual finding he made that was not supported by the evidence. And I just want to touch on that briefly. The core problem is that this case was prosecuted based on, at least as far as Kevin's liability for being the actual shooter, based on his statements to Detective Ballard, Ballard's statements, and there was also, the only other evidence regarding the specific shooting was from the widow, Ms. Ork, and there's some ballistics information. All of that information, all of that testimony was consistent that the shooting took place in the midst of a struggle, and that does not diminish his liability as far as murder, but it is very different than what Judge Shub found at the sentencing hearing, that Kevin came upstairs, saw the situation, the struggle between T. Chan and the two brothers and didn't want to get into the fray and just shot from afar, that it was an intentional killing. And there's absolutely no evidence to support that and it's very contrary to both the way that it was indicted and the way it was tried. And I want to reserve the remaining time for Ms. Long. What about the evidence that the shot was at least 18 inches away? Pardon? Wasn't there evidence that the shot was fired at least 18 inches away? No, it's the opposite. There was a misreading of the forensics testimony from the doctor, and this is at, it's not in the excerpt of records, I'm sorry, but it's at the fourth volume of the reporter's transcripts beginning at page 625, and my copy doesn't have any line numbers on it, I'm sorry, where he says that the muzzle, it was a close gunshot, but the muzzle of the gun was 6 to 18 inches away. So it was not a distant shot. It was, that's very consistent with what Kevin had said during the, his statement to the detective when he was being interviewed. It was less than 6, less than 18 inches, more than 16, not a contact wound, but it's consistent with it being part of a struggle. That's my only point on that. Thank you. Okay, thank you. May it please the Court, I'm Karen Landau and I represent John LeWong. Before I talk about the closing argument in this case, I want to briefly touch on the sentencing issue, the double, the double jeopardy issue as to sentencing. The, in this case, my client, also Minh Nguyen, and I can't recall off the others, and I think perhaps Mr. LeTanaflam, all received, received consecutive sentences both for the 924J, well, it was then 924I, is now 924J, and then 924C. Our argument is that the 924C is a lesser included offense. There is no circuit published authority on this point, but there is a Ninth Circuit Mem Dispo, so holding, and in, in other cases, both out of circuit and in the Northern District of California, the government conceded that it's a lesser included offense. The government has not done so in this case, but I want to make that point. I, I have a couple of questions about the double jeopardy argument. The first is, what difference does it make in view of the extremely lengthy sentences of all of the, of all of these defendants? In other words, a plain error review requires us to find some manifest injustice or something that would change. So what, what would be different? How would their substantial rights be affected? Well, I guess there's, there's two questions there. As to the defendants individually, it probably doesn't make a difference. As to the, the system of justice, it does make a difference because it's an illegal sentence, and there are cases holding that a plainly illegal sentence can constitute, constitutes plain error. Yeah, you know, life plus 80 years, life plus 60 years, it's somewhat of a pyrrhic victory, but it is an illegal sentence and that makes a difference. You said you had another question? I do, and, and you'll have to help me remember the, the various defendants and what they were convicted of. Sure. But were they, weren't they convicted of other crimes other than the, the murder count? Ah, well, they were convicted of, um, um, there were, there were multiple robberies is what you're talking about. Right. Yes. So there were four Hobbs Act conspiracies. That's how the case was charged and tried. So the, the, the, uh, murder only related to one of the robberies. Correct, correct. But there was a 924, if you're asking about that, there was a 924C and a 924J just based on count one, which was the Stockton home invasion. Then there were three other conspiracies, Hobbs Act conspiracies. There was a 924C for each of those. Um, and so the point made in the opening brief is that. You're just talking about the one robbery, there were two. Well, yeah, and actually there's a subsidiary argument, which is that because the statute at the time, uh, provided for five and 20. So five for the first 20 consecutive for the second. So my client and Minh Nguyen should have gotten five for the first. The way the judge did it was he just, he gave them each 80 years. So they got 20 years on each count. It was, you know, appears to be a mistake. Um, uh, since I have very little time, I'm just going to turn quickly to prosecutorial misconduct. So the point here, the critical point is that in closing argument, the prosecutor made a comment which a reasonable jury could have construed as accusing the defense, including defense counsel, of suborning perjury and planning, planning to fabricate a defense. Um, defense counsel objected and his objection was overruled. And there was no correction. There was no correction that could be made because it was closing rebuttal. Um, the government has made a variety of arguments, which I addressed in the reply brief. Um, I will limit myself to saying why it's not harmless error as to my client and, well, as to Minh Nguyen, but, but especially as to my client. The evidence against my client was primarily almost exclusively based on the testimony of informers. All of them had a reason to lie. There were significant inconsistencies in their testimony. The, the, his co-defendant, Kevin Latanifong, got on the stand, gave testimony that indicated my client was not involved, at least in the Stockton homicide murder, which was obviously the main event at the trial. And the most important, the most important, uh, the most serious crime and, and the most evidentiary resources were devoted to it, properly so. Um, but my client was not present at the, at that crime. And there was, and basically it was a he said, she said. It was the government's informers on the one side and it was Mr. Latanifong on the other. And so in that context, in that limited context, accusing the, um, the defense of engaging in fabrication was not harmless. Um, I have less than three minutes. I'm going to save the rest for rebuttal. Unless there are questions. Thank you. We'll hear from the government. Good morning, your honors. May it please the court. My name is Jason hit from the U.S. attorney's office in Sacramento with the court's indulgence. The plan would be I'll address the fair cross section claim and yield the remainder of my time to Mr. Wong to address the balance of issues. Um, in short, the government believes that the defense has failed to prove the second and third prongs of during, as this court pointed out, focusing on the third prong, the evidence submitted and cited in the week's declaration does not pass muster. Table seven, uh, relies a lot on, um, speculation about minority driving habits. It has information about the Pacific region, which does not really delineate whether there's any information specific to the Sacramento division of the Eastern district of California. And as this court does, the expert does say that the results will be ameliorated. If they use DMV records, he, he says, why, why isn't that a, uh, um, factual basis for saying he has looked at these records and he thinks that they are, that, um, including them would, would, um, change the balance. There's two reasons why that doesn't work. The first is he doesn't state the basis for his opinion. It's, it's something that he just states as a general matter based on his review of his experience in other places. The second is that the specific type of evidence required for the third prong, uh, as taught in Hernandez and, and, uh, summarized would be something such as to show systemic, um, that, that the district had failed to summon Hispanics or African Americans while summoning other groups, evidence showing African Americans or Hispanics failed to return questionnaires at a higher rate, uh, than the general population or like in Duran, Duran, uh, Hispanics, African Americans were able to opt out of jury service while other groups could not, um, or like in Duran, Hispanics, African Americans who did not return the questionnaire were presumed then to have opted out while other groups were not or in the 11th circuit case of Gibson that a panel of jury commissioners were giving, given a subjective criteria resulting in systemic exclusion. You're reading off a lot of stuff that he could have said, but he didn't say, but that doesn't really help. The question is why, why isn't what he said enough? I mean, he, he doesn't, you sort of speculate about how he came up with a conclusion as to, uh, what would happen if they use DMV records, but for all we know, he mostly examined the DMV, uh, records and determined that they are, uh, that they are, um, more racially and ethically balanced. I don't know that we know that based on the lack of data. We don't know that. We don't know one way or the other. It's a very speculative. But he does say that. He says it, and it's not based on any, I'm sorry. And he is an expert. He's an expert, but he submitted no data to support his analysis as it relates to Sacramento. That's the question. Does an expert have to submit data? If, if somebody's qualified as an expert and says, makes a statement based on real world evidence, does he have to show his methodology, uh, at, at, at this stage? Now, maybe at trial he would have to be, uh, subject, I mean, obviously he'd be subject to cross-examination. But why is it at this point, uh, the fact that he's an expert and he, uh, he tells us that's the conclusion he comes to based on this data? How, how finally does he have to chop the, the onion? I think the answer is, in this case, the data submitted simply doesn't make a prima facie case. It fails the third prong of Durin. We don't know. We don't know. He could well have looked at the DMV data and found it to be, to be balanced, right? Is there anything about his statement that precludes that? There's nothing in his statement about DMV registration qualifying him. He, and he does say that if they use the DMV records, the problem would be ameliorated or solved. He does say that. And it's, and that's the speculative nature of it. He says it, but he backs it up with nothing. And his own data on the second prong demonstrate- And that's the question. This is what we're going around and around. Why does he have to show his work? Because the- Where, where does it say that as an expert, he has to show his work in order to be, to, to, to be, um, provide sufficient evidence to get past summary judgment? Because both- Well, you know this summary judgment statement, right? I understand. The motion to dismiss. The, the, both Torres Hernandez and, and the more recent Hernandez case demonstrate the district court has an obligation to evaluate the prongs of Durin. And on the third prong, uh, Dr. Weeks' opinion, uh, about the DMV isn't supported and doesn't meet, even if accepted as true, doesn't meet the third prong. Why is this, why is this the kind of thing that if the district court has doubts about, it has to hold a hearing and explore those doubts? Well, even the court, the district court had no reason to doubt that there was no violation of the third prong. There was no violation because on the second prong, Dr. Weeks' own analysis demonstrated no absolute disparity. And at that time, that was the exclusive test. And even now, after Hernandez, it's one of the various tests the court has approved for a district court to evaluate. Could I ask you, uh, a follow-on question related to, uh, something that Judge Kaczynski raised with opposing counsel? Yes, Your Honor. We're dealing only with an allegation of a non-fair cross-section in the grand jury proceeding. Okay. But no such claim with respect to the pedigree that actually tried these defendants and found them guilty beyond a reasonable doubt. Does the subsequent jury trial make moot or irrelevant in some way any error that may have occurred with respect to grand jury composition or proceedings that went before? I think it's a, uh, an issue that this court has not reached yet. I know that in, in some instances, the court has described this challenge, generally speaking, a structural error. But I think Judge Kaczynski's point in your question is very good in that if a probable cause determination at the grand jury stage, uh, is later tested by a pedigree at a beyond a reasonable doubt stage and the defendants are found guilty, it is difficult to understand why the, uh, the pedigree is not challenged and the pedigree was void eared and has not been alleged to have violated the fair cross section claim. I am not aware of this court or even the Supreme Court having really focused on that remedy issue because a lot of times we've just see a lot of, uh, claims that failed the Duren test. And let me just follow up on Judge Kaczynski's question. If the, uh, the judge had, had done, uh, uh, had found that there was a prima facie case here, and, uh, that there was at least a prima facie showing of systemic or systematic exclusion. What's the next step? You know, we're saying that there should have been an evidentiary hearing at which the government could have brought in its own expert and he would make credibility determinations. And, and is that, is that what would happen? As I, as I understand it in the, in the cases where this has been sort of, um, addressed as particularly Justice Ginsburg's most recent Supreme Court decision. And I, I will butcher the pronunciation, but it's Berguse or Bergoyes. What she indicates, because the defense had made an argument and she sort of clips, uh, takes back and says, you know, you kind of clipped some language we used in Duren out of context. And what she says is once the prima facie showing is made by the defense, the government would then have an opportunity in, in a district court proceeding to put on reasons that, uh, the exclusions do not warrant a constitutional violation. In other words, the exclusions, uh, based on voter registrations and the ineligibility of non-English speaking underage, um, various, uh, felons, that kind of thing, that they're all objectively based and that they are not violative of the constitution. And that would be the nature of the hearing. Is there a difference between you and the app a lot with regard to the construction of the word, uh, systematic or systemic? You seem to suggest that it, it requires some level almost of intentionality to exclude a particular group. They seem to say if there's a feature, which seems to have an impact somewhere in, in some way, uh, which results in exclusion, that constitutes a systemic. And so systemic or systematic can be used in different ways. What is that where your difference is? I think, um, I think that the defense view of, of what is required for the third prong is different from the government. I guess to clarify myself, if I've been in artfully either in my brief or in argument, Hernandez teaches to be systematic. And I'm now reading from the decision under representation must be due to the system by which juries were selected. And so intentional is not required because there are cases. I think in one, there was a computer glitch that had unintentionally, but systematically created a problem. But I would submit that on this, in this case, all the prima facie case of Duran is not met on either second or third prong. At that point, I'd like to yield to Mr. Wong, unless the court has further questions. Is he going to deal with, uh, a question of the life? Yes, Your Honor. The sentence. Yes, Your Honor. Okay. If it pleases the court, my name is William Wong. I'm an assistant U.S. attorney from the Eastern district. I was one of the trial attorneys in this matter. Uh, if I could, I can start with, uh, just a basic statement. This case is about four individuals that conspired to use guns and violence to obtain keys to get into a business that dealt in interstate commerce. The defendants in this particular case needed those keys because that was an essential part of their conspiracy. Without that, they could not get into the businesses without risking, uh, interference by police, by the police. Now, with regards to counsel's, uh, prosecutorial misconduct statement, the statement was simply that it was a preplanned, concerted effort by the defense. It did not say counsel. The court who was there at the time, the judge calculated the statement, considered, uh, what would happen, and felt that it was not in reference to any counsel. This was a three-month trial. This was at the very end of the trial. There were over 85 witnesses produced. There were hundreds and thousands of pieces of evidence in this particular case. And it comes down to the one word, defense. Now, it was never the government's intent to include defense attorneys. Never in the course of the trial was there any allegation by the government that the defendant's attorneys acted unprofessionally or unethically. That never occurred. In this particular case, the reasonable inference that was created when Lathanafong, only one of the defendants, one of the four, took the stand was he basically refuted his previous statements that he made two weeks after the murder. This occurred 11 years later. He takes the stand, and what does he do? He basically points the fingers at the three witnesses that are government cooperators. These witnesses were never brought before law enforcement by Lathanafong ever. He brings it up for the very first time. Conversely, he also absolves John LeWong and the other two defendants of any involvement in this particular case. That raises a reasonable inference that something is going on. And while this is not part of the record, John LeWong has a very strong personality that was shown throughout the proceedings. In this particular case, not only did the government have the right to argue reasonable inferences, but to reply to the defense argument during the cross-examination of Lathanafong by Mr. Mazur. Mr. Mazur asked him about, well, are you taking a stand solely to absolve my client? He says, no. Well, we have a right to challenge that. Same thing with the fact that during rebuttal of his closing argument, Mr. Mazur brought that issue up again, that Mr. Lathanafong was not in fear of Mr. Can I just interrupt your narrative long enough? Because I don't want the time to run out. I'd appreciate your addressing the double jeopardy question that I discussed some with opposing counsel, the sentencing double jeopardy under 924. Well, the government position is that the 924C and the 924J are separate offenses. However, Why aren't they one lesser included of the other? I'm sorry, Your Honor. Why isn't the one the lesser included of the other? Well, I think I can shortcut this by saying this. The government will concede that the defendants need to be resentenced on those two counts. And we would ask for a remand for that purpose on those two counts only. You're conceding that they are lesser included. I'm not trying to extract any more out of you than you're willing. I just want to make sure I understand that they cannot be sentenced for both of those. That's correct. Okay. Then we don't need to ask any more questions. Right. But that's only on those two counts. Yes. Understood. We got it. We got it. Thank you, Your Honor. Okay. What about the sentencing for the willful killing, not during the course of a struggle? Well, I think — one second, Your Honor. In the government's brief, I made a mistake in briefing — This is the big fat red brief? What's that, Your Honor? This is the big fat red brief? Yes. Okay. Where are you looking? In the government brief — It doesn't matter. Just give me a page. Okay. I have a second, Your Honor. Page 136, Your Honor. A little bit more than halfway down. It says that the evidence demonstrates that Hong's hands were tied behind his back at a distance of more than 18 inches. I'm sorry. 136 where? What's that? Where on 136? 136, a little bit past halfway down the page. Okay. Okay. What happened here was, during the briefing, I made a mistake in my reading. Basically, the government's theory was, whether or not there was a struggle, that the victim was not close to the assailant, Mr. Lathanafong. And that's borne out by the testimony of Dr. McGurk. You're saying, in your brief, more than 18 inches. And you now concede that's wrong? That is correct. I concede that is incorrect, Your Honor. Okay. But I would point this out. That hiccup only occurred at the briefing stage. It did not occur during the trial. We didn't argue that. I did not argue that. Nor did it occur at sentencing. Well, what are the facts, then, that support the district court's assertion that the killing was intentional? Let's just start with the affirmative, rather than what you're not — you were not arguing. What was in support of that view? I understand. This is the testimony of Dr. Medeiros. He was a pathologist, the expert in this case. It's found on volume 4, page 627, line number — well, I can't quite see the line, but the question is, a little bit past halfway. The question, all right. And in the case of Mr. Hong, Mr. Hong is the decedent. What did the position, the path of the bullet, suggest to you in terms of how he was shot? Answer. Well, since it was a 30-degree angle from the perpendicular, it is obvious he would have to be either, unless it would be a giant assailant with weapons pointing downwards, he would have to be sitting or lying down when he was shot. The testimony and the evidence at trial showed that Mr. Hong's hands were tied behind his back and his ankles were tied. The photographs taken by the coroner indicates that that was his position. He had literature marks on both. He was shot as he was either laying down or coming up. He posed no threat at that point. His hands are tied. Mr. Le Thanaphong, whether or not he shot him, because in the chaos after hearing the eruption of gunfire from the other defendant, it doesn't matter. He, Mr. Le Thanaphong, is the person who carried that black bag that had the blowtorch that they were going to use to torture these people. He brought that and the guns in that black bag. He carried it, according to his own testimony, throughout the three, four hours they were inside the house. These were not home invasion robberies here, not whatsoever. Home invasion robbery, you rob people, you get the heck out of there. You don't want to stick around to have the police show up. They were in there for four hours. And then in the U Street house, they were in there for six hours doing the same thing. They were trying to get the keys and the codes to get into a building of a business that was involved in interstate commerce. Does that answer the question, ma'am? It does. Thank you. So I'd like to also address, I want to kind of just go back to the prosecutorial misconduct issue. I think when you look at the law in this area, the defendant has proved not only that misconduct occurred, which I submit did not, but he has proved prejudice. The case was overwhelming that John LeWong, Minh Nguyen, and LeThanofong were clearly involved in these robberies. This wasn't just one robbery. This case wasn't tried in a vacuum. There were four robberies. All of them had the trademarks of the same thing. They were in there to torture people, to beat them to get a key, to get the codes, to get to the point where they could deplete the inventory of a business that clearly Why was there such delay in bringing this case to trial? The crime occurred in 1996? What's that? The crime occurred in 1996 and 95. 95 and 96. Right. The first group of defendants was tried in 99, and then this group was tried in what, 2005? No, the first defendant group was tried in 2003. 2003. Right. And the second group, this group here, was tried in 2007. 2007. These delays were all at the request of Ten years after the crimes. What's that? Over ten years. Why such delay? The defense kept on firing their lawyers, which caused delay. It's a very complicated case. Discovery were in the hundreds of thousands of pages. There were wire intercepts in this particular case. And each time a new lawyer came into the case, they would ask for, you know, a lengthy period of continuance in order to prepare. And that went on for a long time, which suggested to the government that these defendants were talking to each other regarding the strategy how to proceed on this case. The government wanted to go to trial much earlier than that. We were ready to go to trial a year after this occurred. Okay. Thank you, Your Honor. Also, Your Honor, if I could, there was also a RICO violation prosecution that occurred in the Northern District that was also being prosecuted, and that case went first. So that caused a good part of the delay. Is there any further questions? No. Thank you, Your Honor. Thank you, Your Honors. Regarding the fair cross-representation claim, there's been suggestions about factual development, and the government didn't, the government put on a witness through Dr. Morrison. And Dr. Morrison's, again, this is a supplemental joint excerpt of record at page 72, says Dr. Weeks' analysis is competently done. And he's adopted his whole methodology. He has no disagreements with Dr. Weeks' declarations. And at the time that Dr. Morrison filed this declaration, he had reviewed the first two sets of declarations. So he had looked at, at that point, he had looked at the 2000-2002 jury wheels. The 1998 wheel wasn't present yet. But there's nothing that is different in Dr. Weeks' analysis once that information was gathered. So to suggest that the information that their own expert looked at regarding DMV records, that component is somehow missing because it's not there. Well, their own expert accepts wholly what Dr. Weeks did. To the issue about there being a subsequent jury trial, no challenge. At the time in 2007, there was no issue raised, but Hernandez Estrada hadn't been decided. So under the evidence that they had, if they had pursued it, there would have been no additional claim. That doesn't mean that there was a fair cross representation of the jury, even at the petite jury pool. You have never made that claim, correct? No, I haven't. For purposes of our decision, you must take it as a given that there is no challenge to the fair cross section of the petit jury. True, but we also have to take it as a given that a grand jury challenge is a problem. In grand jury, it's a structural error. And the idea that a petite pool later on cures it, there's no case law that supports that. And then I just want to turn briefly to the struggle. I'm sorry, it's a structural error not to have a fair cross section? If there's a defect in the grand jury, it's a structural error, yes. I think that's what this case and what the Supreme Court has held, both in, I'm just spacing out the names, but I think there is case law that says it's a structural error. I'd be happy to send a 28-J letter with the case once it comes to my mind. Okay. They've conceded the mistake as to the information about the distance. Even in his reply argument, there's no disagreement that the shooting took place in a chaotic struggle. Where the position of different people is, there isn't clear evidence. But there was testimony from, for example, Ms. Ork that the Cambodian, and that was- What evidence is there of a chaotic struggle? Pardon? What evidence is there? The principal evidence they relied on and how it was tried was that it was based on Kevin's testimony, his statement to the Detective Ballard when he was interrogated in Los Angeles County. That talked about the shooting happening in the course of a struggle, that the gun went off. It is not clear. But the judge didn't believe that. No, he did not. So you said there's no dispute. It's like, you know, there was a struggle, but I'm not just wondering- There's no evidentiary dispute. I mean, the alternative is that this was an execution, that the guy was lying there- Which is essentially- Somebody walks up and shoots him in the head. The core problem with the sentencing of Kevin, a 17-year-old, to a life without possibility of parole sentence, based on the judge's finding that this was a deliberate, intentional, premeditated execution. And the evidence is that there was- How else can you do it? Pardon? How else do you do it? How else did somebody get killed is the way that Kevin explained it when- No, no, you say that's the problem with having it based on a distant judge's findings. How else do we do it? We don't have a time machine. Well, the way you do it is you present it to the jury and have them make a finding as to whether it was an intentional murder. It wasn't tried that way. The verdict wasn't presented to them. That's the Fifth and Sixth Amendment problems, is that the judge is making a key aggravating factor that poses this life sentence without parole to a 17-year-old based on his finding, independent of a jury, independent of what was the indictment said. It was pled as a felony robbery, a killing in the course of a robbery. And so you can't switch roles. The jury has an important role. If the jury had found this was an intentional murder, the issue wouldn't be raised in this way. It would be raised more as an Eighth Amendment issue. But the judge has stepped in and made this finding. And my main point on it, it is unreasonable, aside from the Fifth, Sixth, and Eighth Amendment issues, it's unreasonable given the facts that were presented. Ork testified to a struggle. Kevin testified to a struggle. Ballard testified to a struggle. The government said what Kevin told Detective Ballard was the truth. I have nothing else. Do you have anything? Okay. Thank you. The argument will stand submitted. That completes our calendar. We are adjourned. All rise. This court, for this session, is standing adjourned.
judges: Ponsor, Kozinski, Graber